Patrick McILHENNY, Individually and on behalf of all members of a class of New Home Buyers similarly situated, Plaintiff,

v.

AMERICAN TITLE INSURANCE COMPANY et al., Defendants.

Civ. A. No. 72–721.

United States District Court, E. D. Pennsylvania.

June 7, 1976.

**366**

Arnold Levin, Philadelphia, Pa., for plaintiff.

Robert W. Sayre, Gilbert Abramson, Gerald A. Dennehey, Jeffrey Less, Philadelphia, Pa., Harold S. Patton, Levittown, Pa., Robert James Jackson, Chester, Pa., George

F. Shinehouse, Jr., Arsen Kashkashian, Jr., Philadelphia, Pa., Donald J. Orlowsky, Media, Pa., Louis J. Goffman, Bancroft D. Haviland, Philadelphia, Pa., for defendants.

OPINION

DITTER, District Judge.

## I. INTRODUCTION

The primary question raised by the present motion to dismiss this anti-trust action is whether the defendants' activities fall within the "business of insurance" so as to be exempt from the anti-trust laws pursuant to the McCarran-Ferguson Act. I conclude that they do and therefore that the motion to dismiss must be granted.[1]

The plaintiff bought a new house and was charged for mechanic's lien insurance as part of his title insurance policy. The defendants are 20 title insurance companies, all of which transact business in Pennsylvania. The alleged Sherman Act violations consist of a concerted practice by the defendant companies which requires purchasers of newly constructed residences to buy mechanic's lien insurance as part of the services provided by the companies at settlement. The plaintiff claims that although "mechanic's lien insurance is a useless and unnecessary charge since mechanics' liens are, as a matter of course, tradition, custom and statute waived by . . . contractors and subcontractors,"[2] the defendants nonetheless force new home buyers to purchase it by refusing to provide title insurance covering other risks and normal settlement services unless the buyer also purchases mechanic's lien insurance. The plaintiff also brings pendent state claims alleging the defendants' activities violate the gener-

---

1. The plaintiff sought initially to maintain this suit as a class action. By agreement of all parties this court entered an order on January 3, 1972, extending the time within which plaintiff was required to move for a class action determination until 90 days after the determination of defendants' motion to dismiss. Because of the way I dispose of the motion to dismiss any motion to determine a class would now be moot. Having agreed to the adjudica-

tion of the merits prior to the class action determination, the defendants, in effect, chose to rely on stare decisis rather than res judicata if judgment went in their favor. See *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 758–60 (3d Cir.), cert. denied 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

2. Complaint, paragraph 16.

al laws of Pennsylvania and the anti-trust and conspiracy statutes and common law of various other states. The defendants have moved to dismiss the complaint on the grounds that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, exempts insurance companies from the operation of the anti-trust laws in states, such as Pennsylvania, which regulate the insurance business. They also argue that since the federal claims must be dismissed, this court either cannot or should not exercise pendent jurisdiction over plaintiff's state law claims.

## II.  The McCarran-Ferguson Act

The McCarran-Ferguson Act was passed in 1945 in response to *United States v. South-Eastern Underwriter's Ass'n.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). That decision overruled prior precedent, specifically *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1869), and held that the insurance business was subject to the anti-trust laws.

■ Fearing that *South-Eastern Underwriters* would be construed as limiting the states' power to oversee the insurance business, Congress declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011. The purpose of the Act was to "give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946). To carry out this policy, the Act provided, *inter alia*, a three-year moratorium in which various federal laws would be inapplicable to the insurance business. The states were encouraged to create their own regulatory schemes by the Act's proviso that at the end of the moratorium the Sherman, Clayton and Federal Trade Commission Acts "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012. The relevant inquiry in deciding the motion before me is thus (1) whether the practice of the defendants challenged here falls within the term "business of insurance" and (2) whether it is "regulated by state law."

That the title insurance industry in general is pervasively regulated by the Commonwealth of Pennsylvania cannot seriously be disputed and plaintiff makes no attempt to do so. The scope and nature of this regulation is adequately set forth in the thoughtful opinion of my colleague, Judge Edward R. Becker, in *Schwartz v. Commonwealth Land Title Insurance Co.*, 374 F.Supp. 564, 567–69 (E.D.Pa.1974), and need not be repeated.

This extensive regulation coupled with the fact that the complaint essentially challenges the provisions of title insurance policies (and therefore appears to involve the business of insurance, facially supports the defendants' position that the McCarran-Ferguson Act is a bar to this suit. The plaintiff, however, advances three arguments in support of his contention that the motion to dismiss must be denied. First, plaintiff asserts that, despite initial appearances, a closer analysis will reveal the activities of which complaint is made do not constitute the "business of insurance" as that term has been judicially construed. Second, the plaintiff asserts the specific practice at issue here is not sufficiently regulated by Pennsylvania to fall within the Act, despite the pervasive general regulation of the title insurance industry by the Commonwealth. Finally, the plaintiff contends defendants' practices come within the exception contained in section 3(b) of the Act, 15 U.S.C. § 1013(b). I will address these arguments seriatim.

### A.  *The Business of Insurance.*

In *Securities and Exchange Commission v. National Securities, Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969), Mr. Justice Marshall delineated the type and scope of activity intended by Congress to be encompassed within the term "business of insurance:"

Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the

statute apply. Certainly the fixing of rates. is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260 [2 L.Ed.2d 1540] (1958), and the licensing of companies and their agents, cf. *Robertson v. People of State of California*, 328 U.S. 440, 66 S.Ct. 1160 [90 L.Ed. 1366] (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, *the type of policy which could be issued*, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—*it was on the relationship between the insurance company and the policyholder.* Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance." (Emphasis added.)

Plaintiff's claim that the activity he challenges here does not constitute the business of insurance is bottomed on the well known fact that "in the usual situation, title insurance is indispensable to the occurrence of the real estate sale." *Schwartz*, supra at 574. The plaintiff contends that because of their indispensability, title insurance companies are able to dictate the terms of property settlements. From this assertion, plaintiff alleges that an agreement among the defendants not to provide other settlement services to buyers of newly constructed residences unless they also purchase mechanic's lien insurance in reality involves, not the business of insurance, but the "business of real estate sales." Brief for Plaintiff at 8. Plaintiff seeks to bolster this argument by contending that where mechanics' liens have been expressly waived, the risk of loss is nonexistent and any contract purporting to cover such a hazard cannot properly be called "insurance." I do not agree.

The mere fact that the services performed by a title insurance company are an indispensable part of the transfer of real estate does not remove those services from the sphere of the insurance business. See *Schwartz*, supra at 574–75. If this were the case, not only mechanic's lien insurance, but every other risk covered or service provided by title insurance companies would fall beyond the "business of insurance" perimeters. Acceptance of plaintiff's argument also would have effects reaching far beyond the title insurance industry. As a practical matter there are numerous, everyday transactions which depend on the availability of various types of insurance. Many states, Pennsylvania among them, require automobile insurance in one form or another. In these states the obtaining of insurance is a prerequisite to the lawful operation of a motor vehicle. Banks and other lending institutions customarily require the purchasers of new automobiles to carry collision insurance as a prerequisite to obtaining financing.[3] Building contractors are frequently required to have liability and workmen's compensation coverage. Leases, particularly of commercial property, customarily require one of the parties to carry insurance. These are but a few examples; there are many others. Plaintiff's theory would mean that in each of the examples just given the insurance companies would not be engaged in the business of insurance be-

**3.** By giving this example I do not mean to suggest that in cases where an insurance company or other institution is acting primarily as a *money lender* a tie-in arrangement requiring the purchase of insurance from the same or a related entity would necessarily be exempt from the anti-trust laws. See *Fry v. John Hancock Mutual Life Ins. Co.*, 355 F.Supp. 1151 (N.D.Tex.1973). But cf. *Addrisi v. Equitable Life Ins. Soc.*, 503 F.2d 725 (9th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400, reh. denied 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790 (1975).

cause their activities have collateral consequences in other areas. In short, plaintiff's theory would carve out of the McCarran-Ferguson Act a large amount of activity that has traditionally been regarded as part of the business of insurance.

█ Plaintiff's contention that where there has been a waiver of mechanics' liens, there is no risk and thus nothing to insure is an over simplification. In the first place, the obtaining of a waiver and the willingness of a title insurance company to issue its policy are not simply ships which pass in the night but are engine and hull of the same vessel. The very basis on which a company is willing to insure title is the obtaining of a mechanic's lien waiver. If there is no waiver, there may be no insurance. Obviously, the company's insistence on a waiver of mechanics' liens is one of the ways it tries to minimize the risk of loss—in much the same way that a workmen's compensation carrier will try to minimize its risk of loss by requiring an employer to institute certain safety practices. In neither case, however, does the attempt mean that liability is eliminated entirely. So far as mechanics' liens are concerned, "waivers" have been held to be untimely, defective, insufficient, and fraudulent. By statute, 49 P.S. § 1402, Pennsylvania set forth exactly what is required to waive a mechanic's lien and the ten pages of case annotations which accompany the provisions of that act are ample proof that questions have arisen and continue to arise on this subject.[4]

█ Plaintiff's real complaint is that he has been forced to purchase protection which *he* does not want. In essence, he charges that defendants' rates are too high—either because payment must be made for coverage which has no value, or because the purchase of unnecessary coverage is required in order to obtain protection and services which are desired. Matters of rate, extent of coverage, and policy provisions go to the very heart of the relationship between the insurance company and

the policyholder and therefore clearly fall within the *National Securities* definition of the business of insurance.

**B.** *Regulation by State Law.*

█ Plaintiff next seeks to escape the reach of the McCarran-Ferguson Act by arguing that the specific practice of the defendants which is at issue here is not sufficiently regulated by Pennsylvania, despite the Commonwealth's pervasive, general control of the insurance industry. This argument reflects a fundamental misunderstanding of what is meant by state regulation. The rule is well settled that the term "regulated by state law" as used in the Act means only that the state have a general regulatory scheme governing the conduct of the insurance business and not that there must be a statute or regulation dealing specifically with the practice in question. *Federal Trade Commission v. National Casualty Co.*, 357 U.S. 560, 564–65, 78 S.Ct. 1260, 1262, 2 L.Ed.2d 1540 (1958), well illustrates this principle: there the Court rejected the notion that a general statutory prohibition designed to guarantee certain standards of conduct was too "inchoate" to constitute "regulation." As long as the state "has enacted prohibitory legislation" which is not a mere pretense and has "authorized enforcement through a scheme of administrative supervision," it has regulated the business of insurance. In *California League of Independent Insurance Producers v. Aetna Casualty and Surety Co.*, 175 F.Supp. 857, 860 (N.D.Cal.1959) it was held that

> [A] State regulates the business of insurance within the meaning of [the McCarran-Ferguson Act] when a state statute generally proscribes . . . or permits or authorizes certain conduct on the part of the insurance companies.

The foregoing standard of what constitutes state regulation has been applied more recently by the Sixth Circuit in *Ohio AFL–CIO v. Insurance Rating Board*, 451

4. For example, *Stringer & Bowers, Inc. v. On-Line Systems, Inc.*, 236 Pa.Super. 196, 345 A.2d

194 (1975), deals with a purported fraudulent waiver of mechanics' liens.

F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972). When faced with the argument that statutory inadequacies and enforcement laxity in Ohio's system of insurance regulation rendered the McCarran-Ferguson Act inapplicable, the court responded:

> The conclusory statements of the complaint in this case that Ohio has not regulated this type of insurance business or that it has not effectively done so are, in our view, untenable.

.    .    .    .    .

> An ideal type of regulation may possibly envision the removal of the alleged deficiencies in the Ohio statutes referred to by the appellant. Yet the question before us is not whether the Ohio method of regulation compares favorably with the regulations of other states, or whether it is an ideal manner in which to regulate the business of insurance. We are confident that Congress in enacting the McCarran Act did not intend to impose a uniform standard of regulation upon all of the states. It is our view that the congressional intent was to leave to the judgment of each state the specifics of regulation which it should see fit to adopt. Suffice it to say at this point that we are confident that the comprehensive plan adopted by Ohio is fully adequate to meet the requirements of regulation contemplated by the McCarran Act.

451 F.2d at 1181, 1183. The court also found

> .    .    .    no support for the appellants' argument that the court in this case should inquire into the question as to whether the statutes of Ohio have been effectively enforced in accordance with their terms.    .    .    .    [T]here is nothing in the language of the McCarran Act or its legislative history to support the thesis that the Act does not apply when the state's scheme of regulation has not been effectively enforced.

451 F.2d at 1184. See also *Lawyers Title Co. of Missouri v. St. Paul Title Ins. Corp.,* 526 F.2d 795 (8th Cir. 1975).

■ The plaintiff seeks to distinguish the instant matter from those discussed above on the grounds that there is no applicable state statute that generally proscribes, permits, or authorizes *the practice here in question.* Even if the suggested distinction existed, which it most certainly does not,[5] the result would not change because the point of those cases is that

> The McCarran-Ferguson Act does not require an examination into the regulatory status of every detail of the business of insurance; it is sufficient that the state

5. Under both the present and former versions of the Unfair Insurance Practices Act, 40 P.S. §§ 1171.1–.15, *formerly* Act of June 5, 1947, P.L. 455, No. 202, unfair methods of competition or unfair or deceptive acts or practices in conducting the business of insurance are prohibited. The Unfair Practices Act gives the Commissioner of Insurance broad powers of enforcement. He is authorized to conduct investigations of alleged unfair practices, hold hearings, issue cease and desist orders, seek injunctions and assess penalties. If, as alleged, the practice in question here is in fact unfair it may constitute an "unfair method of competition" or an "unfair or deceptive act or practice" as defined in section 1171.5 and be prohibited under section 1171.4. Moreover, other statutes give the Commissioner of Insurance extensive authority over the rates and conditions for the issuance of insurance. Every manual of classifications, rules, plans, schedules of fees and commissions must be submitted to the Commissioner for his approval and must indicate the *character and extent of coverage.* 40 P.S. § 910–37(a), (c). All filings must be accompanied by a statement of justification. 40 P.S. § 910–38. No company may charge any fee for any policy or contract of title insurance except in accordance with these filings. 40 P.S. § 910–37(h). The rates charged by title insurance companies may not be higher than necessary to cover their expenses and losses and to make a reasonable profit. 40 P.S. § 910–39(b). In addition, cooperation and concert of action among title insurance companies and rating organizations in rate making and other matters is specifically authorized by statute. 40 P.S. § 910–41(c). The authority given the Commissioner under these statutes clearly extends to the mechanics' liens coverage involved in this case. The fact that the Commissioner has not attempted to prohibit the defendant from engaging in the challenged practice does not mean it is not regulated, for as Judge Becker noted in *Schwartz,* supra, at 577 n. 16, "the Department can obviously regulate by silent approval as well as by disapproval."

regulatory scheme is comprehensive and meaningfully administered.

*Schwartz,* supra at 575. Since the plaintiff does not and could not argue that Pennsylvania's regulatory scheme is a mere sham,[6] the fact that no statute or regulation specifically deals with the practice here in question is irrelevant.

### C. *Boycott, Coercion or Intimidation.*

The plaintiff's final contention is that the defendant's conduct comes within section 3(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1013(b), which provides:

> Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or any act of boycott, coercion or intimidation.

The defendants concede that if the challenged practice is covered by section 3(b) they are subject to suit under the Sherman Act irrespective of state regulation. *Monarch Life Insurance Co. v. Loyal Protective Life Insurance Co.,* 326 F.2d 841 (2d Cir. 1963), cert. denied 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.,* 179 F.Supp. 65 (N.D.Cal.1959); *Professional and Business Men's Life Insurance Co. v. Bankers Life Co.,* 163 F.Supp. 274 (D.Mont.1958); *United States v. New Orleans Insurance Exchange,* 148 F.Supp. 915 (E.D.La.), aff'd per curiam, 355 U.S. 22, 78 S.Ct. 96, 2 L.Ed.2d 66, reh. denied, 355 U.S. 908, 78 S.Ct. 329, 2 L.Ed.2d 262 (1957).

■ The plaintiff's theory as to boycott, coercion, or intimidation is that the defendants have coerced new home buyers into the payment of an unnecessary charge for mechanic's lien coverage by denying them other services essential to settlement unless such payment is made. The fact that this charge is arrived at by agreement among the defendants also is claimed to amount to a concerted refusal to deal except at a fixed price.[7] The short answer to these contentions is that even if this conduct on the part of the defendants might be characterized as a boycott, coercion or intimidation, section 3(b) was intended to cover a rather narrow area of activity totally foreign to anything involved here. As explained in *Transnational Insurance Company v. Rosenlund,* 261 F.Supp. 12 (D.Or. 1966):

> The legislative history [of the McCarran-Ferguson Act] shows that the boycott, coercion and intimidation exception, was placed in the legislation to protect insurance agents from the issuance by insurance companies of a "black-list," which would name companies or agents which were beyond the *pale.* This list, in effect, was a directive to an agent not to write insurance in the name of or for the black-listed company; otherwise he would be stripped of his agency and not be permitted to write insurance for any of the members of the governing organization of insurance companies.

*Id.* at 26–27. *Meicler v. Aetna Casualty and Surety Co.,* 372 F.Supp. 509 (S.D.Tex. 1974), aff'd 506 F.2d 732 (5th Cir. 1975) is closely on point also. The plaintiffs in *Meicler* advanced essentially the same boycott, coercion, etc., argument made by the plaintiff here: viz., that the insurance companies agreement to reclassify the plaintiffs into a less favorable and thus more costly automobile risk category amounted to a concerted refusal to deal except at a fixed price. In rejecting this argument, the court stated:

> It cannot be disputed that the terms boycott and coercion, as commonly defined, might be construed to encompass the type of activity attributed to Defendants in the instant case. An examination of the legislative history of this section reveals, however, that Congress was seeking to regulate a rather narrow area of activity bearing no resemblance to the situation

---

**6.** No claim is made that Pennsylvania does not enforce its regulatory scheme and the scheme itself is, if anything, more comprehensive than

that of Ohio which was involved in the *Ohio AFL–CIO* case.

**7.** Brief for Plaintiff at 17.

described in Plaintiffs' Complaint. Section 1013(b) was designed primarily to deal with conspiracies or combinations among insurance companies and agents for the purpose of boycotting or refusing to deal with other insurance companies and agents.

*Id.* at 513–14. My own research confirms the finding of the *Meicler* court that no decision has applied section 1013(b) "in the context of an alleged combination of insurance companies to boycott, coerce or intimidate *policyholders at large.*" *Id.* at n. 9. (emphasis added). As the Ninth Circuit noted in *Addrisi v. Equitable Life Assurance Society,* 503 F.2d 725, 729 (1974), cert. denied 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400, reh. denied, 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790 (1975) to do so "would vitiate the McCarran-Ferguson Act in its concept of setting over unto the several states the regulation of the insurer-insured relationship."

For the reasons stated above, plaintiff's federal claims based on sections 1 and 2 of the Sherman Act are dismissed. One final point remains, however.

### III. Pendent State Law Claims

■ The defendants' motion to dismiss plaintiff's federal claims is based on the alternative grounds of (1) failure to state a claim upon which relief can be granted and (2) lack of subject matter jurisdiction in this court. The precise basis on which the motion is granted is important for the purpose of determining the status of plaintiff's pendent state law claims. If the motion is granted on the basis of lack of subject matter jurisdiction it means that this court lacks judicial *power* to hear plaintiff's federal claims. That being the case, it is clear that this court would also lack judicial power to hear plaintiff's state claims no matter how closely related to his federal claims they might be. On the other hand, if the motion is granted for failure to state a claim upon which relief can be granted, it

does not mean that this court lacks judicial power to hear the case, but only that the plaintiff's federal claims are legally insufficient. In that instance this court may still have judicial power to hear the pendent state claims if the federal claims are substantial and if "the state and federal claims derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Whether to exercise such power if it existed would then lie within the sound discretion of the court depending upon considerations of judicial economy, convenience, and fairness to litigants. *Id.* at 726, 86 S.Ct. at 1130.

■ Since 28 U.S.C. § 1337 confers jurisdiction in the district courts over suits brought under the Sherman Act and since the McCarran-Ferguson Act does not purport to withdraw *jurisdiction* [8] of Sherman Act suits from the district courts in cases where it applies, the only possible basis upon which the court might lack subject matter jurisdiction over plaintiff's federal claims is the doctrine of insubstantiality. In relevant part that doctrine holds that

federal courts are without power to entertain claims otherwise within their jurisdiction if . . . ' "[their] unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." ' *Ex parte Poresky,* 290 U.S. 30, 32, 54 S.Ct. 3, 4, [78 L.Ed. 152] (1933) quoting *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 288, 30 S.Ct. 326, 327, [54 L.Ed. 482] (1910).

*Hagans v. Lavine,* 415 U.S. 528, 536–38, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974) quoting *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 858–59, 35 L.Ed.2d 36 (1973).

■ Recognizing that *Hagans* set a very low threshold of merit for a claim to satisfy the substantiality test, I nonetheless conclude that the authorities discussed in part

---

**8.** Rather than withdrawing jurisdiction of antitrust suits from the district courts in cases where it applies, the McCarran-Ferguson Act merely makes the remedy of resort to the antitrust laws unavailable in such cases.

II of this opinion render plaintiff's federal claims insubstantial. Unlike *Hagans* where the Supreme Court's prior decision in *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) "evinced no intention to suspend the operation of the Equal Protection Clause in the field of social welfare law," 415 U.S. at 539, 94 S.Ct. at 1380, the purpose of the McCarran-Ferguson Act, as the authorities discussed in part II of this opinion make clear, is to suspend the operation of the anti-trust laws in the very area in which plaintiff seeks to invoke them.

Since I have concluded that plaintiff's federal claims are insubstantial and must be dismissed for lack of subject matter jurisdiction, it necessarily follows that this court has no power to adjudicate his pendent state claims.[9] Accordingly, plaintiff's state law claims are also dismissed.

---

9. Even if I had concluded that plaintiff's federal claims were not insubstantial and had dismissed them instead for failure to state a claim, the fact that they were dismissed before trial and that the state claims involve an area within the expertise of a state administrative body persuade me that it would have been inappropriate to exercise discretionary jurisdiction over them in any event. See *Moor v. County of Alameda,* 411 U.S. 693, 715–17, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Gibbs,* supra, 383 U.S. at 726, 86 S.Ct. at 1139.