Donald L. ANGLIN, Plaintiff,

v.

BLUE SHIELD OF VIRGINIA and Blue Cross of Virginia.

Civ. A. No. 80–0073(C).

United States District Court, W. D. Virginia.

March 2, 1981.

Craig T. Redinger, Charlottesville, Va., for plaintiff.

James H. Walsh, Richmond, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

### I. INTRODUCTION ·

Plaintiff, Donald L. Anglin ("Anglin"), filed this complaint pursuant to the Sherman Antitrust and Clayton Acts, specifically 15 U.S.C. §§ 1, 2, 4, 5, 22 against Blue Shield and Blue Cross of Virginia ("Blue Cross and Blue Shield," or collectively "the Plans"). Plaintiff alleges that while he purchased nongroup family health care contracts from the plans, they would not provide precisely the coverage he desired (i. e., coverage for himself and a dependent son, but not for his wife, who had health insurance through her employer). Plaintiff maintains that federal and state[1] antitrust laws compel Blue Cross and Blue Shield to sell him a health insurance contract that covers him and his son but excludes his wife.

The Plans have filed a Motion to Dismiss, contending that (1) plaintiff's claims are barred by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, (2) plaintiff's factually unsupported allegations of conspiracy are insufficient as a matter of law, (3) the coverage terms of an insurance policy cannot "restrain trade" within the meaning of the Sherman Act, (4) plaintiff has failed to allege an actionable attempt to monopolize, (5) plaintiff has not suffered "antitrust injury", and (6) plaintiff lacks standing. The issues have been briefed and argued by counsel, and the matter is now ripe for disposition.

### STATEMENT OF FACT

Blue Cross and Blue Shield are nonprofit, nonstock Virginia corporations, organized under enabling legislation set forth in Virginia Code §§ 38.1–810 through 38.1–834. Blue Shield operates a plan for furnishing prepaid medical and surgical services pursuant to § 38.1–811. Blue Cross operates a plan for providing hospital and related services pursuant to § 38.1–810. The Plans sell health insurance policies known as subscriber contracts to individuals and groups within a service area established by the Virginia State Corporation Commission ("SCC"). Under these subscriber contracts, the Plans agree to provide subscribers with medically

---

1. See Virginia Code (1950) (as amended), §§ 59.1–9.1 *et seq.*

necessary physician (Blue Shield) or hospital (Blue Cross) services, or both, covered by the contract, in return for monthly premiums or dues. An optional feature available in most, if not all, such service contracts is a coverage known as Major Medical Coverage, intended to insure against the costs of catastrophic illnesses, where costs are substantially above the coverage afforded under the ordinary physician and hospital contracts. The Major Medical Coverage carries an additional premium charge.

The Plans are closely related. Although separately incorporated, they share common officers. Blue Shield has no employees, and contracts with Blue Cross for all required management services. The Blue Cross, Blue Shield, and Major Medical contracts are marketed as a package by Blue Cross employees. As a matter of state law, the Plans do not compete with each other. *See* § 38.1–822.1. They must, however, compete with hundreds of commercial insurance companies, Health Maintenance Organizations ("HMO's"), governmental health insurance programs, and self-insurers.

Conceptually, the Plans differ from most insurance programs, since, under most of the Plans' contracts, subscribers receive pre-paid, paid-in-full physician and hospital services rather than indemnity benefits. Such coverage is made possible by the Plans' participating physician and hospital agreements, pursuant to which participating medical doctors and hospitals contractually agree to render services to the Plans' subscribers and to accept the Plans' allowances as payment in full for covered services. Virginia law requires all physicians and hospitals participating in a Blue Shield or Blue Cross plan to be jointly and severally liable on all contracts made by the Plans. § 38.1–814.

The SCC has been given plenary regulatory authority over the Plans. In addition to specific Code provisions applicable only to prepaid health care plans, §§ 38.1–810 through 38.1–834, the Plans are subject to major portions of the Virginia Insurance Code and the Virginia Antitrust Act, §§ 59.1–9.1 et seq. The SCC establishes the Plan's service areas, § 38.1–822.1, reviews and approves in advance the form of all subscriber contracts, § 38.1–342.1, and generally oversees the Plans' operations.

Plaintiff Anglin is a Blue Cross and Blue Shield subscriber. He purchased nongroup family contracts from the Plans which provide primary health care benefits for all members of his family. Anglin maintains, however, that he only wanted to purchase coverage for himself and a dependent son. His wife apparently receives at least some health insurance benefits from her employer. For actuarial reasons, Blue Cross and Blue Shield do not write the coverage Anglin desires.

Blue Cross and Blue Shield offer subscribers a series of nongroup contracts with three coverage options: (1) a subscriber only contract, (2) a subscriber/one minor contract (further described *infra*), and (3) a family contract. Under the provisions of § 38.1–342.1, *supra*, the forms of the various policies offered by the Plans have already been approved by the SCC, which provisions set out a comprehensive and detailed set of standards to be met in securing such approval. These nongroup contracts are in large measure a public service program offered by the Plans to ensure that health insurance is available to all Virginia citizens, and no subscriber is denied coverage as a result of utilization, age, or previous state of health. "Community rating" (sometimes known as "pooling"), in conjunction with the so-called "true family status rule", which Anglin specifically challenges in this action, make such coverage possible. "Community rating" refers to a method of setting rates so that subscribers in a definable affinity group are charged the same rate regardless of the risk represented by an individual subscriber within the group.

To avoid the need for "individual underwriting" used by most commercial carriers, the Plans' nongroup contracts are governed by the "true family status rule", which require a subscriber to enroll according to

marital status.[2] Marital status creates one of the largest possible affinity groups against which to spread risks, thereby maintaining costs at an affordable level for all nongroup participants. Since the "true family status" rule creates the pool against which rates are determined, deviations would violate the actuarial assumptions on which the rating structure is based, and so could invalidate that rating structure for the entire non-group program. If Anglin were successful in this suit, he would pay less for coverage than the underwriting risk he represents, other participants would pay more, and the premiums of all nongroup subscribers would rise.[3]

The Plans could underwrite their nongroup contracts on the basis of health, age, sex, and similarly-recognized underwriting criteria. To do so, however, would deprive a large number of subscribers of health insurance, and would be inconsistent with the public service nature of the Plans. Thus, marital status is the only underwriting criterion imposed by the Plans in the nongroup program. Anglin argues, however, that this basic underwriting decision restrains trade and constitutes an attempt to monopolize the health care insurance market. He further alleges that Blue Cross and Blue Shield combined and conspired with each other, their member doctors and hospitals, and the national Blue Cross and Blue Shield organizations to implement this policy. Consequently, on August 4, 1980, plaintiff filed this suit.

## II. MERITS OF PLAINTIFF'S CLAIM

The court notes that the McCarran-Ferguson Act acts to exempt the "business of insurance" from the reach of the Sherman, Clayton, and Federal Trade Commission Acts, if it is sufficiently regulated by state law and, in the case of the Sherman Act, in the absence of "act(s) of boycott, coercion, or intimidation".[4] The court must now determine whether the Plans' contracts with their subscribers constitute the "business of insurance" which is regulated by the Commonwealth of Virginia. The Court must also determine whether the Plans constitute a boycott, a coercion, or intimidation.

### A. The Business of Insurance

■ Even though the term "business of insurance" is the cornerstone of the McCarran-Ferguson Act, the Act fails to define it.

---

**2.** There are two exceptions: (1) If the subscriber's spouse is covered under a Blue Cross, Blue Shield, or commercial group contract, and the subscriber is not eligible for coverage under that contract, or (2) if the subscriber's spouse is eligible for Medicare and the subscriber is not, the subscriber can purchase either a subscriber only or subscriber/one minor contract, neither of which exceptions apply to Anglin in this case.

**3.** The "true family status" rule also provides for ease in administration, an important factor in a nonprofit, public service insurance program. The subscriber simply has to check off the appropriate box on the application. Since physicals are not required, correspondence between the Plans and physicians, consent forms, and the like, all become unnecessary.

**4.** The McCarran-Ferguson Act provides in relevant part:

Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically related to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1980, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law....

Sec. 3(b) Nothing contained in this Act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation. 15 U.S.C. §§ 1012, 1013(b).

Additionally, a joint Congressional Committee recently gave resounding support to the McCarran-Ferguson Act:

"The conferences wish to indicate their strong reaffirmation of the basic policy of the McCarran-Ferguson Act: that the business of insurance is to be regulated by the states." 126 Cong.Rec. H3149, 3157 (May 1, 1980).

The United States Supreme Court, however, has clearly delineated its scope and focus.

The McCarran-Ferguson Act was an attempt ... to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation ...

[T]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance". Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policy holder.

*SEC v. National Securities, Inc.*, 393 U.S. 453, 459–60, 89 S.Ct. 564, 568–569, 21 L.Ed.2d 668 (1969).[5] As it appears that plaintiff's complaint relates to the extent of insurance coverage, which tends to go to the very heart of the relationship between an insurance company and its policyholders, the Court must conclude that this activity constitutes the "business of insurance". *c. f. McIlhenny v. American Title Insurance Co.*, 418 F.Supp. 364 (E.D.Pa.1976).

### B. State Regulation

The Court notes that established Supreme Court precedent, as well as numerous decisions in the Fourth Circuit and elsewhere, conclusively establish that a *general* undertaking by a state to regulate the insurance industry is all that is required to satisfy the "state regulation" aspect of the McCarran-Ferguson Act. *See, e. g., Federal Trade Commission v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958); *Ohio AFL–CIO v. Insurance Rating Board*, 451 F.2d 1178 (6th Cir. 1971), cert. denied, 409 U.S. 917, 93 S.Ct. 215, 34

L.Ed.2d 180 (1972); *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.*, 175 F.Supp. 857 (N.D.Cal.1959). This is the case because,

State power to regulate necessarily includes the discretion to prohibit, permit or limit insurance practices as the state sees fit. The McCarran-Ferguson Act clearly contemplates that where a state undertakes to regulate the business of insurance, it has the power to permit practices which would otherwise violate the federal antitrust laws; if the exemption is only to apply when state law squarely prohibits all acts which would, absent the exemption, violate the antitrust laws, the state regulation which the McCarran-Ferguson Act aims to foster ... would be a nullity.

*Dexter v. Equitable Life Assurance Society*, 527 F.2d 233, 236 (2d Cir. 1975) (Emphasis added). *See also United States v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29 (N.D.Ga.1977); *McIlhenny v. American Title Insurance Co.*, 418 F.Supp. 364 (E.D.Pa.1976).

The Court now finds that the regulatory scheme set up by the Commonwealth of Virginia clearly satisfies the "state regulation" aspect of the McCarran-Ferguson Act. Every aspect of the business of insurance is regulated by the Bureau of Insurance of State Corporation Commission ("SCC"), acting pursuant to an insurance code comprising some 342 pages of the Code of Virginia, portions of which were specifically enacted to take advantage of the McCarran-Ferguson Act. *See* Virginia Code (1950) (as amended) §§ 38.1–49—38.1–57.1; and §§ 59.1–9.1 *et seq.*

In this aspect, it is significant to note the breadth of the authority of the SCC, and the particularity with which various prohibited practices are spelled out. § 38.1–53 grants to the SCC "... power to examine and investigate into the affairs of every person engaged in the business of insurance

---

5. *See Bartholomew v. Virginia Chiropractors Association*, 612 F.2d 812 (4th Cir. 1979), cert. denied 446 U.S. 938, 100 S.Ct. 2158, 64 L.Ed.2d 791 (1980) where the Fourth Circuit concluded

that even activities by non-insurance companies merely "touching upon" the business of insurance are protected by the McCarran-Ferguson Act.

in this State in order to determine if such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by § 38.1–51 of this Article". § 38.1–51 prohibits such unfair methods of competition and deceptive acts and practices. § 38.1–52 defines unfair methods of competition and unfair or deceptive acts or practices, in nine subsections, among them subsection 4, for "Boycott, Coercion, and Intimidation", and subsection 7(b) prohibiting "unfair discrimination" in relation to contracts for health insurance. Other similar provisions permeate the Insurance Code as a whole.

Certainly, the pervasive and inclusive scheme of regulation given to the SCC to regulate the business of insurance, with the concomitant power in the SCC to correct error, prevent evil, and to control the activities undertaken in the business of insurance are such that the Court must conclude that the SCC would be a more appropriate forum for hearing and determining the plaintiff's complaints.

It is sufficient in this branch of the opinion to say that such a pattern of statutory authority to regulate the business of insurance constitutes fully adequate state regulation for purposes of the McCarran-Ferguson Act, *see, e. g. Crawford v. American Title Insurance Co.*, 518 F.2d 217 (5th Cir. 1975); *Steingart v. Equitable Life Assurance Society*, 366 F.Supp. 790 (S.D.N.Y. 1973); *Transnational Insurance Co. v. Rosenlund*, 261 F.Supp. 12 (D.Or.1966), and the adequacy of the Virginia regulatory program has never been doubted. *See, e. g., Proctor v. State Farm Mutual Automobile Insurance Co.*, 561 F.2d 262 (D.C.Cir.1977), *judgment vacated on other grounds*, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631

(1979); *Bartholomew v. Virginia Chiropractors Association, supra.*

*C. Boycott, Coercion, Or Intimidation*

■ The McCarran-Ferguson Act's exemption of the "business of insurance" from Sherman Act liability is ineffective to the extent that acts of "boycott, coercion, or intimidation" are involved. 15 U.S.C. § 1013(b). "Boycott" under the Sherman Act is a "concerted refusal to deal," *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 536, 98 S.Ct. 2923, 2927, 57 L.Ed.2d 932 (1978), *quoting Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3, 8 (1st Cir. 1977). Therefore, this is the standard which the court will use to see if the Plans constitute an "agreement to boycott, . . ." which could remove it from the shield of the McCarran-Ferguson Act.

■ In reviewing the record in this case, the Court finds no antitrust boycott (i. e., the Court finds no concerted refusal to deal by competitors).[6] Obviously the Plans deal with the plaintiff since he is a subscriber. Additionally, none of the alleged co-conspirators (i. e., Blue Cross, Blue Shield, and their respective national associations) are competitors, which is the hallmark of a boycott.[7] While the Plans have unquestionably not offered to the plaintiff the coverage he seeks, that coverage is not offered to anyone by the Plans, because it is not a coverage written by the Plans. While comparison is odious in general, and dangerous in particular in an opinion, at least an analogy can be drawn between the situation at bar, and a suit against General Motors and Ford Motor Co. because neither will now sell a 1981 convertible automobile to the plaintiff customer. The fact that neither

**6.** *See FMC v. Svenska Amerika Linien*, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1969); *North American Soccer League v. National Football League*, 465 F.Supp. 665 (S.D.N.Y. 1979). *See also Card v. National Life Insurance Co.*, 603 F.2d 828 (10th Cir. 1979).

**7.** As the District Court in *Call Carl, Inc. v. BP Oil Corp.*, 403 F.Supp. 568 (D.Md.1975), *affirmed in part and reversed in part on other grounds*, 554 F.2d 623 (4th Cir. 1977), *cert.*

*denied* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977), held:

> Common sense dictates the conclusion that where conspirators are *not* competitors in the market in which prices are allegedly being fixed, *and* there is horizontal competition in that market, then no harm can be done, and therefore no restraint of trade can be accomplished by, and agreement to refuse to deal or to fix prices.

403 F.Supp. at 572–73 (Emphasis by Court).

motor company now offers a convertible model in the marketplace is at least analogous to the fact that the Plans do not offer in the marketplace the coverage desired by the plaintiff here.

Nor is the court persuaded by plaintiff's argument that the Plans are guilty of "tying" their products, which plaintiff contends is equivalent to a "conditional boycott". For a tie-in to exist, there must be at least two separate products, *see, e. g., Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In this case, only a single family policy is at issue. Moreover, even if a tie could be established, such arrangements have consistently been construed as the "business of insurance" and not "boycotts". As the Fifth Circuit has explained:

> Forcing people to buy insurance may well be an undesirable practice—and we do not suggest that we approve of it—but it is part of "the business of insurance" . . . An insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship, and thus constitute an integral part of "the business of insurance".

*Dexter v. Equitable Life Assurance Society, supra* at 235. *See also Addrisi v. Equitable Life Assurance Society,* 503 F.2d 725 (9th Cir. 1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975); *Mathis v. Automobile Club Inter-Insurance Exchange,* 410 F.Supp. 1037 (W.D.Mo.1976); *Holly Springs Funeral Home, Inc. v. United Funeral Service, Inc.,* 303 F.Supp. 128 (N.D.Miss.1969).

In sum, a purchaser's free choice of a product in a competitive market (his acceptance of an offer to deal) cannot constitute an antitrust boycott (a concerted refusal to deal). As the Fourth Circuit has held, a "boycott" requires duress or coercion. *Bartholomew, supra,* 612 F.2d at 818.

Additionally, plaintiff has not alleged the necessary "coercion or intimidation". Actual punitive acts, not simply "economic" compulsion, must at least be demonstrated. *See, e. g. United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); *Proctor, supra; American Family Life Assurance Co. v. Blue Cross of Florida, Inc.,* 486 F.2d 225 (5th Cir. 1973), *cert. denied,* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); *Frankford Hospital v. Blue Cross of Greater Philadelphia,* 417 F.Supp. 1104 (E.D.Pa. 1976), *aff'd per curiam,* 554 F.2d 1253 (3rd Cir. 1977), *cert. denied,* 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977); *American Family Life Assurance Co. v. Aetna Life Insurance Co.,* 368 F.Supp. 859 (N.D.Ga. 1973).

For the above reasons the Court must conclude that plaintiff's claims are barred by the McCarran-Ferguson Act, 15 U.S.C. § 1011–1015 since the underwriting policy plaintiff challenges is the "business of insurance", which is regulated by state law and which policy does not constitute acts of "boycott, coercion, or intimidation". Accordingly, the Court will issue an appropriate order granting defendants' Motion to Dismiss.