A. Alexander PIRENO,
Plaintiff-Appellant,

v.

NEW YORK STATE CHIROPRACTIC
ASSOCIATION and Union Labor Life
Insurance Company, Defendants-Appellees. ·

No. 245, Docket 80–7507.

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1980.

Decided May 28, 1981.

Donald West, New York City, for plaintiff-appellant.

Robert P. Borsody, New York City (Philip M. Berkowitz, Epstein Becker Borsody & Green, P.C., New York City, on the brief), for defendant-appellee New York State Chiropractic Association.

T. Richard Kennedy, New York City (George T. Vogel, Cabell, Kennedy, Hammer & French, New York City, on the brief), for defendant-appellee Union Labor Life Ins. Co.

Sidney S. Rosdeitcher, New York City (Howard S. Veisz, Richard D. Friedman, Nancy A. Kilson, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for The Health Ins. Ass'n of America as amicus curiae.

Before KAUFMAN, KEARSE, and BRIGHT,* Circuit Judges.

KEARSE, Circuit Judge:

This appeal by plaintiff-appellant A. Alexander Pireno, a chiropractor, requires us to determine whether the exemption from the federal antitrust laws created for "the business of insurance" by § 2(b) of the McCarran-Ferguson Act (the "Act"), 15

* Honorable Myron H. Bright of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

U.S.C. § 1012(b) (1976), applies to an insurer's practice of submitting claims for chiropractic services to a peer review committee, composed of chiropractors, which opines whether the services rendered and fees charged are "usual," "reasonable," "customary," or the like, within the meaning of the insurance policy. The district court held that the peer review practice instituted by defendant-appellee New York State Chiropractic Association ("NYSCA"), and availed of by defendant-appellee Union Labor Life Insurance Company ("ULL"), was exempt from antitrust scrutiny under § 2(b), and therefore granted summary judgment dismissing Pireno's complaint for injunctive and declaratory relief under the federal antitrust laws and for damages under state libel law. [1979–2] Trade Cas. (CCH) ¶ 62,758 (S.D.N.Y.1979). Our own reading of § 2(b) in light of the Supreme Court's decision in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("*Royal Drug*"), persuades us that the § 2(b) exemption does not shield the peer review procedure from examination under the antitrust laws. Accordingly, we reverse the order and remand the matter for further proceedings.

## I. FACTS AND PRIOR PROCEEDINGS

This case arises from the efforts of the chiropractic profession to obtain for its practitioners and their patients the benefits of contemporary health insurance programs. Until the early 1970's, many health insurance carriers excluded chiropractic services from coverage under their policies. Although New York amended its insurance laws in 1971 to require health insurance carriers to pay certain claims for services performed by a chiropractor, *see* N.Y. Ins.Law § 221(5)(e) (McKinney Supp.1980–1981), carriers and their medical advisors were frequently unfamiliar with chiropractic, and they therefore found it difficult to determine whether the services rendered and fees charged to insurance claimants were "usual," "customary," and "reasonable" within the limitations of typical health insurance policies. Responding to this situation, which adversely affected the chiropractors' livelihood and their patients' ability to obtain needed services, NYSCA, a nonprofit New York corporation, established a peer review committee in 1971.

The peer review committee, comprised of ten New York chiropractors, was intended primarily to aid insurers in evaluating claims for chiropractic services. Under the procedures it eventually adopted, the committee renders an opinion on the reasonableness of a chiropractor's treatment and charges in a given case at the request of the insurer; the assessment of the treatment is based on information concerning the patient supplied by the insurance carrier and the treating chiropractor, while the assessment of fees takes into account a variety of factors, including the amount and type of care provided, the condition and history of the patient, and the location and training of the treating chiropractor. Opinions of the committee are not binding unless the parties agree beforehand that they will be. Although the committee's review procedure is used primarily by insurers, it is also available to patients, governmental agencies, and chiropractors themselves. In addition to reviewing claims, the committee serves to some extent as a monitor of professional ethics and as a public relations organ.

ULL, a Maryland insurer doing business in New York, has been using the committee's claims review procedure since January 1973. ULL issues several types of policies that cover chiropractic services, all or most of which contain some sort of "reasonableness" limitation on the coverage provided. For example, its "major medical" and "basic" health care policies limit coverage to "reasonable charges for necessary medical care and services," and its "supplemental accident expenses" plan limits coverage to charges "not in excess of the regular and customary charges for the services and treatment furnished." When ULL determines that a particular claim is substantially above past chiropractic claims it has received for similar services, it refers the matter to the committee for review in accordance with the procedures described above. Although ULL apparently has nev-

er entered into an agreement with a claimant whereby it would accept the committee's determination as binding, plaintiff contends that ULL undeviatingly abides by such determinations.

Pireno has been the subject of peer review proceedings on a number of occasions.[1] The defendants assert that Pireno treats his patients in a manner calculated to maximize the number of treatments for a particular condition, and that his fees for these treatments are unusually high. For his part, Pireno contends that the committee members, who are not named as defendants in this action, practice "antiquated" techniques that they seek to impose on their more innovative competitors. The dispute between Pireno and NYSCA culminated in the filing of the present lawsuit by Pireno in September 1976.[2]

In his complaint, Pireno alleged that ULL, NYSCA, and other unidentified persons had combined to restrain trade in chiropractic services in violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976). Specifically, Pireno alleged that NYSCA and ULL conspired to employ the peer review committee and its claims review procedure as a means of fixing prices for chiropractic services. Plaintiff sought declaratory and injunctive relief against the alleged conspiracy. In addition, he asserted that NYSCA had libeled him by sending copies of the committee's opinion letters concerning his charges and methods of practice to his patients.[3] He sought $1 million in damages for the alleged defamations.

After extensive discovery, NYSCA and ULL moved for summary judgment dismissing the complaint. The motions were granted on the ground that the defendants' actions were exempt from the antitrust laws by virtue of § 2(b) of the McCarran-Ferguson Act. While recognizing that the Supreme Court's decision in *Royal Drug, supra*, had narrowed the § 2(b) exemption for the "business of insurance" to such core insurance functions as the underwriting and spreading of risk, the district court held that the defendants used the peer review procedure for underwriting and risk-spreading purposes, and that the procedure therefore constituted the "business of insurance." In addition, the court held that the procedure was sufficiently regulated by state law to come within the § 2(b) exemption, and that Pireno had failed to produce sufficient evidence that the procedure entailed a "boycott, coercion or intimidation" subject to the antitrust laws under § 3(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1013(b). Finding the defendants' antitrust immunity therefore complete, the court dismissed Pireno's Sherman Act claim, and declined to retain jurisdiction over his state law libel claim.[4]

1. Plaintiff and defendant NYSCA dispute the number of times plaintiff's patients' claims have been referred to the peer review committee, plaintiff asserting that there were over forty referrals, defendant contending that there were only twelve.

2. Plaintiff Pireno apparently became an enthusiastic supporter of peer review shortly after NYSCA instituted the procedure in 1971. At the time, Pireno was engaged in a running dispute with ULL concerning its former practice of sending claims substantiation forms to the treating chiropractor in connection with most of its insureds' claims for chiropractic services; Pireno sought to charge ULL a $25.00 fee for completing each form, and ULL refused to pay. Pireno then adopted a policy of requesting peer review whenever ULL asked him to substantiate a claim. Subsequently, however, ULL began on its own initiative to submit Pireno's patients' claims to the peer review committee, and on several occasions the committee disapproved the claim. As Pireno puts it, these experiences with the peer review committee persuaded him that he "was dealing with the enemy rather than with allies." This litigation ensued.

3. Defendants contend that the committee never sent copies of its opinion letters to plaintiff's patients.

4. In his complaint, Pireno had also named as a defendant the International Chiropractors Association ("ICA"). The district court's grant of summary judgment dismissing the complaint as to NYSCA and ULL did not deal with ICA, and the judgment entered on that decision on March 20, 1979, was not then final and appealable under 28 U.S.C. § 1291 (1976). Pireno nonetheless filed a notice of appeal on April 18, 1979. Thereafter, the action was dismissed with prejudice as to ICA, pursuant to a stipulation "so ordered" by the district court on June

**390**

On appeal, Pireno contends that the defendants' use of the peer review procedure is not entitled to antitrust immunity, arguing principally that peer review is not the "business of insurance" within the Supreme Court's interpretation of that phrase in *Royal Drug, supra.* We agree, and we reverse the order of the district court and remand the action for further proceedings.[5]

## II. DISCUSSION

### A. *McCarran-Ferguson* and Royal Drug

Enacted in response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which overturned settled precedent by holding that the writing of insurance was "commerce" subject to federal regulation under the Commerce Clause of the Constitution,[6] the McCarran-Ferguson Act expresses a strong federal policy favoring state regulation of the insurance industry. In § 1 of the Act, Congress declared "that the continued regulation and taxation by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011 (1976). Section 2 provides in part as follows:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

*Id.* §§ 1012(a), (b). The statute thus preserves broad state authority to regulate "the business of insurance," and provides a broad immunity from federal regulation not specifically directed to the insurance business.

The McCarran-Ferguson Act also contains one important exception to the general rule of immunity from federal regulation, for it expressly provides only a limited immunity from the federal antitrust laws.[7] Thus § 2(b) states the proviso that the principal federal antitrust laws "shall

---

11, 1979. The premature notice of appeal did not deprive the district court of jurisdiction to enter such an order, *Leonhard v. United States*, 633 F.2d 599, 609–10 (2d Cir. 1980), and the June 11 order ended the case with respect to the only remaining defendant. Hence, we treat the March 20, 1979, judgment as having become final and appealable on June 11, 1979, *see Jetco Electronic Indus. Inc. v. Gardiner*, 473 F.2d 1228, 1231 (5th Cir. 1973), and treat Pireno's early notice of appeal as having been timely filed thereafter.

5. In view of our disposition of the "business of insurance" issue, we need not decide whether New York has regulated the peer review process to such an extent as to satisfy the "state regulation" requirement of the McCarran-Ferguson antitrust defense. We observe, however, that defendant NYSCA itself does not appear to be regulated by state law in the manner § 2(b) requires. Although N.Y.Ins.Law § 271 (McKinney 1966) brings "corporation[s] . . . engaged in the business of insurance" within the jurisdiction of state insurance authorities, the statute was fairly clearly drafted with the focus on corporations in the insurance industry. The fact that NYSCA is a corporation that advises an insurer as to the reasonableness of chiropractic fees makes it no more a member of the insurance industry than would be a fi-

nancial consultant who advises an insurer on the prudent investment of its reserves.

6. The assumption that insurance transactions were not "commerce" can be traced to *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1868), in which the Court held that a state statute which regulated foreign insurers was not invalid under the Commerce Clause because "issuing a policy of insurance is not a transaction of commerce." Subsequent cases repeated and broadened this statement. *See United States v. South-Eastern Underwriters Ass'n, supra*, 322 U.S. at 543–44 & n.18, 64 S.Ct. at 1168–69 & n.18. In *South-Eastern Underwriters*, a criminal prosecution for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the court reversed direction and rejected the argument that Congress had no power to regulate the insurance practices alleged in the indictment, holding that "the business of insurance" was indeed "commerce" subject to federal regulation. 322 U.S. at 539–53, 64 S.Ct. at 1166–1173.

7. The McCarran-Ferguson Act also specifies that certain federal labor laws remain applicable to the business of insurance. 15 U.S.C. § 1014.

be applicable to the business of insurance to the extent that such business is not regulated by State law." *Id.* § 1012(b). In addition, under section 3(b) of McCarran-Ferguson, the Sherman Act remains applicable to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation," *id.* § 1013(b), even if the activity in question would otherwise be exempt from the antitrust laws by virtue of § 2(b). Thus, as the district court observed, the McCarran-Ferguson immunity to antitrust claims has three prerequisites: (1) the challenged conduct must constitute the "business of insurance"; (2) the conduct must be regulated by state law; and (3) it must not take the form of boycott, coercion, or intimidation. [1979–2] Trade Cas. (CCH) ¶ 62,-758, at 78,376.

In *Royal Drug, supra,* the Supreme Court sharply restricted the availability of this antitrust exemption by placing a narrow construction on the statutory concept of the "business of insurance." The case involved an antitrust challenge to certain agreements between Blue Shield of Texas, a health insurer, and several pharmacies; the agreements obligated contracting pharmacies to provide prescription drugs to Blue Shield's insureds at a fixed markup of $2.00 per prescription.[8] The plaintiffs, independent pharmacies that had not entered into such provider contracts with Blue Shield, alleged that the contracts were agreements to fix the prices of drugs and constituted a group boycott of nonparticipating pharmacists, in violation of § 1 of the Sherman Act.

The defendants, Blue Shield and some of its participating pharmacies, contended that the provider contracts constituted the "business of insurance" and that the other requirements of the McCarran-Ferguson exemption were met. Overturning what was then the prevailing view among the courts of appeals,[9] and adopting a narrower reading of the statutory language than had been suggested by its own prior decisions, *see* Note, *The Definition of "Business of Insurance" Under the McCarran-Ferguson Act After* Royal Drug, 80 Colum.L.Rev. 1475, 1479–81 (1980), the Court held that the disputed provider agreements were not "the business of insurance," and that the defendants' practices were therefore not immune from antitrust scrutiny.

In reaching this conclusion, the Court began with the premise that the McCarran-Ferguson antitrust exemption "is for the 'business of insurance,' not the 'business of insurers.'" 440 U.S. at 211, 99 S.Ct. at 1073. *See also SEC v. National Securities, Inc.,* 393 U.S. 453, 459–60, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). It therefore considered whether the disputed provider contracts bore the essential characteristics of insurance, which the Court characterized as "the spreading and underwriting of a policy holder's risk," *Royal Drug, supra,* 440 U.S. at 211, 99 S.Ct. at 1073. The Court noted that the provider contracts did not spread the risks insured against, but were "merely arrangements for the purchase of goods and services" that reduced the insurer's cost of meeting its obligations to its insureds. *Id.*

---

**8.** Under Blue Shield's provider contracts, participating pharmacies were required to supply prescription drugs to Blue Shield's insureds for a fixed fee of $2.00 per prescription; the pharmacy was then able to recover directly from Blue Shield the cost of obtaining the drug. If the insured chose a pharmacy that had not entered into a provider contract with Blue Shield, he was obligated to pay the full price for the prescription, and could then recover from the insurer 75% of the difference between that price and $2.00. As the *Royal Drug* Court noted, the terms of the provider contracts were such that only pharmacies whose distribution costs were less than $2.00 could profitably participate in the plan, *see* 440 U.S. at 209, 99 S.Ct. at 1072, and the terms of Blue Shield's insurance policies would naturally encourage

its insureds to patronize only participating pharmacies.

**9.** The Supreme Court cited the decision of the Fifth Circuit in *Royal Drug*, 556 F.2d 1375 (1977), which it affirmed, as being "in conflict with" the decisions of the courts of appeals in *Frankford Hospital v. Blue Cross,* 554 F.2d 1253 (3d Cir.) (per curiam), *cert. denied,* 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977); *Anderson v. Medical Service,* 551 F.2d 304 (4th Cir. 1977) (mem.); and *Proctor v. State Farm Mutual Automobile Ins. Co.,* 561 F.2d 262 (D.C. Cir.1977), *vacated and remanded mem.,* 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979). *See* 440 U.S. at 208–09 n.2, 99 S.Ct. at 1072 n.2.

at 214, 99 S.Ct. at 1074; *see id.* at 213–15, 99 S.Ct. at 1074–75. In addition, while noting that its decision in *SEC v. National Securities, Inc., supra,* had stressed protection of an insurer's reliability as an aspect of "the business of insurance," the Court rejected the argument that the provider contracts so closely affected Blue Shield's reliability as to constitute the "business of insurance," reiterating that the contracts were merely cost-cutting devices. *Royal Drug, supra,* 440 U.S. at 215–17, 99 S.Ct. at 1075–76. Thus, the Court concluded that the provider agreements did not bear any of the essential characteristics of insurance, and so could not constitute "the business of insurance."

The Court found additional support for its conclusion in the history and purpose of the McCarran-Ferguson Act. The Court noted that, although the legislation initially proposed would have completely exempted the insurance industry from the antitrust laws, *id.* at 218–19, 99 S.Ct. at 1076, the statute as enacted was designed to provide "only a limited exemption from the antitrust laws," *id.* at 218 n.18, 99 S.Ct. at 1076 n.18. Quite apart from preserving state authority to tax and regulate the insurance industry, Congress had generally intended that the antitrust laws apply to insurers' activities, save as to certain core activities —"the business of insurance"—when regulated by state law.[10] *Id.* at 219–20, 99 S.Ct. at 1077–78. These core activities were intended to include the transfer and spreading of risk, but not mere cost-cutting devices:

> References to the meaning of the "business of insurance" in the legislative history of the McCarran-Ferguson Act strongly suggest that Congress understood the business of insurance to be the underwriting and spreading of risk. Thus, one of the early House Reports stated: "The theory of insurance is the distribution of risk according to hazard, experience, and the laws of averages.

These factors are not within the control of insuring companies in the sense that the producer or manufacturer may control cost factors." H.R.Rep. No. 873, 78th Cong. 1st Sess. 8–9 (1943).

*Id.* at 220–21, 99 S.Ct. at 1078 (footnote omitted). Thus, while an insurance company obviously would not long remain viable if it continually incurred exorbitant expenses, this phenomenon is hardly unique to insurers qua insurers, and *Royal Drug* therefore clearly indicates that mere cost-cutting devices are not the "business of insurance":

> If agreements between an insurer and retail pharmacists are the 'business of insurance' because they reduce the insurer's costs, then so are all other agreements insurers may make to keep their costs under control—whether with automobile body repair shops or landlords.[40]

---

[40] There is no principled basis upon which a line could rationally be drawn that would extend the McCarran-Ferguson Act exemption only to an insurer's agreement with providers of goods and services to be furnished to its policy holders—such as agreements with hospitals, doctors, lawyers, and the like. But assuming that such a line could rationally be drawn, to hold that even such provider agreements are the "business of insurance" is to ignore the language and purpose of the Act not to exempt the insurance industry as such from the antitrust laws.

*Id.* at 232, 99 S.Ct. at 1083. Finally, the Court's review of the legislative history indicated that Congress had adopted the antitrust exemption primarily to accommodate the industry's need for cooperative rate-making, an activity involving only insurers inter se and distinctly different from the purchase of goods and services from noninsurers pursuant to the challenged provider contracts. *Id.* at 220–24, 99 S.Ct. at 1078–80.

■ Thus, under *Royal Drug,* the McCarran-Ferguson antitrust exemption for "the business of insurance" is to be strictly limited to only the quintessential insurance functions. With this background in mind,

---

10. The structure of the statute supports this analysis. Section 2(b) provides that the antitrust laws "*shall be applicable* to the business of insurance" to the extent that it is unregulated by state law. (Emphasis added.) Of course, the antitrust laws apply to activities that are not "the business of insurance," regardless of state regulation.

we consider whether the peer review procedure challenged here constitutes "the business of insurance."

### B. *Peer Review and the "Business of Insurance"*

We begin with *Royal Drug's* basic premise that "the underwriting or spreading of risk is a critical determinant in identifying insurance." 440 U.S. at 213, 99 S.Ct. at 1074; *id.* at 211, 99 S.Ct. at 1073. This being so, an activity or procedure that does not either transfer risk from insured to insurer or spread the risk among insureds is not the business of insurance. We find neither risk transference nor risk spreading in the peer review process.

Peer review is plainly not a form of risk-spreading. That concept, as used in *Royal Drug*, refers to the fact that insurance disperses the risk of loss that will be suffered upon the occurrence of a particular event over a large number of policyholders, not all of whom will actually experience the event, so that each policyholder can purchase protection against the loss for a premium amount substantially smaller than the loss he would sustain if the event were to occur to him. *See* 440 U.S. at 211, 99 S.Ct. at 1073, citing 1 G. Couch, Cyclopedia of Insurance Law § 1:3 (2d ed. 1959). *See also* Note, *supra*, 80 Colum.L.Rev. at 1478. Peer review has no role in the spreading of risk in this fashion. Nor does it transfer risk. The risk that an insured will require chiropractic treatment has been transferred from the insured to the insurer by the very purchase of insurance. Peer review takes place only after the risk has been transferred by means of the policy, and then it functions only to determine whether the risk of the entire loss (the insured's cost of treatment) has been transferred to the insurer—that is, whether the insured's loss falls within the policy limits. Peer review is thus not a means of transferring risk from insured to insurer. At most, it is an aid in determining the scope of the transfer after it has been made.

The district court held, and defendants here urge, that peer review does transfer risk because it determines "the extent to which an individual insured must bear the full cost of chiropractic services, or instead have that cost borne by the insurer." [1979–2] Trade Cas. (CCH) ¶ 62,758, at 78,-377. With due respect to the district court, we believe this argument fails. To the extent that a policyholder must bear the cost of a particular loss, he has obviously retained the risk of that loss, and has not transferred it to his insurer. *Cf. SEC v. Variable Annuity Life Insurance Co.,* 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). Thus, the fact that a policyholder may be required to bear part or all of the cost of chiropractic services as a result of peer review does not mean that peer review transfers risk in the sense contemplated by *Royal Drug.* On the contrary, peer review merely measures the extent to which a policyholder has failed to effect such a transfer.

Viewed from this perspective, peer review is simply a form of cost reduction. By enabling an insurer to judge more precisely whether a chiropractor's fees and course of treatment are "reasonable," "usual," or the like, peer review inevitably permits the insurer to minimize its costs. First, it reduces the likelihood that an insurer will mistakenly pay a claim for charges or treatments that fall outside the policy limits. Second, and more fundamentally, the more precise enforcement of these policy limitations made possible by peer review enables the insurer more effectively to prevent, or at least diminish, increases in the cost of the chiropractic services that it has agreed to indemnify:

A policy that pays only the "usual" charges for a service will induce policyholders to avoid patronizing more expensive providers. To the extent that a significant portion of the population holds such policies, prices for the services in question will tend to remain at the current "usual" level; increases that might otherwise occur will be hampered. This stabilization of prices in the community will in turn be reflected in the insurer's own costs.

Note, *supra*, 80 Colum.L.Rev. at 1487.[11] Thus peer review, like the provider contracts at issue in *Royal Drug*, "serve[s] only to minimize the costs [the insurer] incurs in fulfilling its underwriting obligations." 440 U.S. at 213, 99 S.Ct. at 1074 (footnote omitted). Because peer review, like the provider contracts, does not transfer or spread risk but merely cuts costs, it is not "the business of insurance" within the meaning of the McCarran-Ferguson Act.

This analysis largely answers the defendants' other principal arguments. Relying on the Supreme Court's statements that "the core of the 'business of insurance'" concerns such matters as "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement," *Royal Drug, supra*, 440 U.S. at 215–16, 99 S.Ct. at 1075, quoting *SEC v. National Securities, Inc., supra*, 393 U.S. at 460, 89 S.Ct. at 568, defendants argue that peer review constitutes "the business of insurance" because the peer review committee mediates disputes between insurer and insured, interprets the policy limitations, and performs functions similar to those of an insurance adjuster. We think, however, that *Royal Drug* sets forth a substantially narrower scope for the "business of insurance" exemption than its approving citation of *National Securities* might suggest.[12] *National Securities* involved the relationship between an insurance company and its stockholders,

not the relationship between insurer and insured. Thus the *National Securities* Court's observation that the business of insurance primarily concerns the latter relationship sought merely to exclude the "markedly different" relationship of insurer to stockholder, 393 U.S. at 460, 89 S.Ct. at 568, and it certainly did not indicate that all facets of the relationship between insurer and insured are the business of insurance. Indeed, *Royal Drug* makes clear that some are not, since it held *not* the "business of insurance" provider contracts whose effect was to require any insured who selected a nonparticipating pharmacy to pay more for drugs than if he had selected a participating pharmacy. (*See* note 8 *supra*.) Here, an insured who consults an unreasonably expensive chiropractor will be required to pay more than if he had consulted one whose charges were "reasonable." We see no meaningful difference between the effects on the insurer-insured relationship in *Royal Drug* and in the present case.

Moreover, although it is true that the peer review committee performs an "adjusting" function commonly performed by insurance industry personnel, that fact alone cannot convert peer review into "the business of insurance." First, it is by no means clear that claim-settlement itself constitutes "the business of insurance" within the meaning of the antitrust exemp-

11. Peer review may offset this effect on prices to some extent, for committee members' self-interest may cause them to set the "usual" rate above prices that would otherwise obtain in the market. Nonetheless, the inevitable effect of peer review would seem to be stabilization of prices and mitigation of future price increases, provided that insurers actually follow the committee's recommendations.

The commentator quoted in the text accompanying this footnote argues that a policy limiting coverage to "usual," "customary," or "reasonable" charges itself falls outside "the business of insurance," regardless of whether peer review is used to enforce these policy limits. Note, *supra*, 80 Colum.L.Rev. at 1487–88. The status of defendant ULL's policies is not before us, and we of course express no views upon the subject. We note in passing, however, that the specification of the terms of the contract between insurer and insured seems far more closely associated with the business of insurance than does the use of consultants in interpreting the policy limits.

12. One commentator has suggested that the phrase "the business of insurance" may have a broader meaning in those provisions of the McCarran-Ferguson Act that preserve state insurance laws from federal preemption than it does in the § 2(b) antitrust exemption, and that this duality of meaning explains the apparent inconsistency of *Royal Drug*, which interpreted the § 2(b) exemption, with earlier cases that interpreted the other provisions. *See* Note, *supra*, 80 Colum.L.Rev. at 1481–84. We have no occasion to pass upon this theory in the present appeal, but note that statutory language may sometimes be more fluid than the well-known "rule of consistency" in statutory interpretation might suggest.

tion as interpreted in *Royal Drug*. *See* Note, *supra*, 80 Colum.L.Rev. at 1487. Second, it remains true that the peer review committee is not a member of the insurance industry, and that the antitrust exemption seeks primarily to shield agreements among insurers, not those between insurers and persons outside the industry. *See Royal Drug, supra*, 440 U.S. at 221–22, 224–25 n.32, 99 S.Ct. at 1080 n.32. Thus we conclude that the resemblance of peer review to intraindustry claims adjusting does not warrant a departure from the analysis compelled by *Royal Drug*.[13]

In sum, we hold that peer review is not "the business of insurance" within the meaning of § 2(b) of the McCarran-Ferguson Act, and that defendants' use of the procedure is therefore not immune from scrutiny under the antitrust laws. Accordingly, we reverse the order of the district court dismissing the complaint, and remand for further proceedings.[14]

**13.** We adhere to this conclusion even though the Fourth Circuit recently reached a contrary result in a factually identical case, *Bartholomew v. Virginia Chiropractors Ass'n, Inc.*, 612 F.2d 812 (4th Cir. 1979), *cert. denied*, 446 U.S. 938 (1980). Defendants argue that because the Supreme Court declined to grant certiorari in *Bartholomew* even though it was the first significant post-*Royal Drug* decision by a court of appeals, and because the facts of the case were identical to those presented here, the decision is "more than just precedent" and that it carries a weight "approaching a collateral estoppel or a *res judicata* effect." We cannot agree. The denial of certiorari has no precedential significance, *see generally* Linzer, *The Meaning of Certiorari Denials*, 79 Colum.L.Rev. 1227 (1979), and defendants have not asserted that Pireno was a party to, or was in any way

represented in, the *Bartholomew* litigation. Accordingly, *Bartholomew* has no preclusive effect upon Pireno, and it has no more precedential force than any other decision of one of our sister circuits. It is persuasive authority, but we remain free to disagree with it, and we do so disagree.

**14.** We decline the defendants' invitation to affirm the order on the basis of the other defenses raised in their answers to plaintiff's complaint. These are matters better addressed to the district court in the first instance, *see Dandridge v. Williams*, 397 U.S. 471, 475–76 n.6, 90 S.Ct. 1153, 1156–57 n.6, 25 L.Ed.2d 491 (1970), and our disposition of this appeal expresses no opinion as to the merits of plaintiff's claims.