**Danny Ray GRANT, Individually and as Administrator of the Estate of Lynda D. Grant, Deceased; et al., Plaintiffs,**

v.

**ERIE INSURANCE EXCHANGE; et al., Defendants.**

Civ. A. No. 80–1281.

United States District Court, M. D. Pennsylvania.

June 8, 1982.

Richard C. Angino, Benjamin & Angino, P.C., Marvin Beshore, Beshore & Bickley,

Harrisburg, Pa., Arnold Levin, Michael D. Fishbein, Adler, Barish, Levin & Creskoff, Philadelphia, Pa., for plaintiffs.

John G. Harkins, Jr., Fred Speaker, Nancy J. Gellman and Lynne E. Delanty, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Aetna Cas. & Sur. Co.

Christopher Zettlemoyer, Reed, Smith, Shaw & McClay, Harrisburg, Pa., for Travelers Ins. Companies.

David C. Eaton, W. E. Shissler, Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for Kemper Ins. Co.

Rod J. Pera, H. Lee Roussel, McNees, Wallace & Nurick, Harrisburg, Pa., and James P. Schratz, Richard E. Dobson, Robert L. Fleischman, San Francisco, Cal., for Fireman's Fund Ins. Co.

Walter R. Milbourne, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., Luther E. Milspaw, Jr., Harrisburg, Pa., for Keystone Ins. Co.

Patrick W. Kittredge, Benjamin A. Levin, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Employer's Ins. of Wausau.

Bernard A. Ryan, Jr., Stephen A. Stack, Jr., Harrisburg, Pa., Alan H. Silberman, William T. Barker, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Allstate Ins. Co.

James K. Thomas, James K. Thomas, II, Thomas & Thomas, Harrisburg, Pa., for Commercial Union Assur. Co., Nationwide Mut. Ins. Co., Donegal Mut. Ins. Co., Prudential Property & Cas. Ins. Co., Royal Globe Ins. Co., Shelby Ins. Co. and Aetna Cas. & Sur. Co.

Terry R. Broderick, Robert E. Kelly, Jr., Duane, Morris & Deckscher, Harrisburg, Pa., for State Farm Mut. Auto. Ins. Co.

Edward E. Knauss, III, Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., John H. Mudd, Alan N. Gamse, David M. Buffington, Semmes, Bowen & Semmes, Baltimore, Md., for Maryland Cas. Co.

John G. Harkins, Jr., Philadelphia, Pa., Thomas B. Schmidt, III, Pepper, Hamilton & Sheetz, Harrisburg, Pa., for Aetna Cas. &

Sur. Co., Hartford Ins. Group, General Acc. Group.

John B. Mancke, Mancke & Lightman, Harrisburg, Pa., for Home Ins. Co.

Alexander Kerr, Hunt, Kerr, Bloom & Hitchner, Philadelphia, Pa., Carl Anthony Maio, Asst. Gen. Counsel, Harleysville, Pa., for Harleysville Ins. Co.

Craig A. Stone, Goldberg, Evans & Katzman, Harrisburg, Pa., Richard A. Kleine, Jeanne Crandall Zelkowitz, Howrey & Simon, Washington, D.C., for American States Ins. Co., United States Fidelity & Guaranty Co., Pennsylvania Nat. Ins. Group, Motorists Ins. Companies and State Auto. Mut. Ins. Co.

Rod J. Pera, McNees, Wallace & Nurick, Harrisburg, Pa., and Sonnenschein, Carlin, Nath & Rosenthal, for Ohio Cas. Ins. Co.

Joseph A. Tate, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for Insurance Co. of North America.

William J. Keating, Caldwell, Clouser & Kearns, Harrisburg, Pa., for Statesman's Group (now Auto. Underwriters).

Theodore H. Lunine, Bennett, Bricklin & Saltzburg, Philadelphia, Pa., for Safeco Ins. Co.

Joseph R. Thompson, Philadelphia, Pa., for Liberty Mut. Ins. Co.

Steven A. Asher, LaBrum & Doak, Philadelphia, Pa., for Ohio Cas. Ins. Co.

John B. Mancke, Mancke & Lightman, H. Lee Roussel, Rod J. Pera, Harrisburg, Pa., for Home Ins. Co.

H. Lee Roussel, Rod J. Pera, McNees, Wallace & Nurick, Harrisburg, Pa., for Erie Ins. Exchange.

## MEMORANDUM AND ORDER

HERMAN, District Judge.

On November 5, 1980, Plaintiffs[1] commenced this antitrust class action against thirty-one Defendant Insurance Companies[2] pursuant to 15 U.S.C. §§ 1 through 7, 13 and 15, *as amended.* In the complaint, Plaintiffs allege that Defendants have conspired in restraint of trade to deny work loss benefits to individuals killed in motor vehicle accidents occurring on or after July 19, 1975. This alleged conspiracy consisted of an agreement or agreements among Defendants to refuse to offer insurance coverage with respect to work loss benefits of deceased victims of motor vehicle accidents, not to pay claims for such benefits, to conceal from potential claimants the right to bring such claims, and to provide a joint and uniform defense to claims for work loss benefits. In response, Defendants filed twenty motions to dismiss on behalf of twenty-four Defendants, four motions for judgment on the pleadings on behalf of four Defendants, and a motion for summary judgment on behalf of three Defendants.[3] The parties have submitted numer-

---

1. In paragraph 9 of the complaint, Plaintiffs allege:

   Representative Plaintiffs are the Administrators of the Estates of deceased victims of motor vehicle accidents killed after the effective date of the Pennsylvania No-Fault Motor Vehicle Insurance Act, to wit, July 19, 1975.

2. By motion filed on January 19, 1981, Plaintiffs sought to amend the complaint to add three Defendants, namely, Insurance Federation of Pennsylvania, National Association of Independent Insurers, and The American Insurance Association. On the same day, the court ordered Defendants to show cause why Plaintiffs should not be permitted to amend the complaint. Although Defendants, at a conference held on January 28, 1981, indicated that they had no position on Plaintiffs' motion, the court inadvertently failed to grant the motion to amend. We find no reason to correct that

oversight because of the decision we reach today.

3. Upon request by Plaintiffs, the court designated this action as complex litigation and directed that a preliminary pretrial conference be held on January 28, 1981. At that conference, the court ordered a stay of all discovery pending disposition of Defendants' dispositive motions and extended the time within which Plaintiffs could file a motion for class action certification. On March 20, 1981, Plaintiffs filed their motion for class certification and a supporting brief, to which Defendants jointly responded on April 2, 1981. Defendants maintained that consideration of the class certification issue should await the court's ruling on dispositive motions. In light of the nature of this action, the court agreed with Defendants' position. In any event, Plaintiffs' motion for

ous briefs with regard to these motions and oral argument was held on March 13, 1981.[4]

*I. Introduction*

The controversy in this action surrounds provisions of the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 P.S. §§ 1009.101–701 (Purdon's Supp. 1981), that provide for payment of work loss benefits to persons who suffer injuries arising out of the maintenance or use of motor vehicles. 40 P.S. §§ 1009.201–202. The Act establishes minimum insurance coverage for specified victims or survivors of deceased victims. The basic loss benefits include allowable expenses, work loss, replacement services losses and survivors losses. 40 P.S. § 1009.202. As defined by the Act,

"Work loss" means:

(A) loss of gross income of a victim, as calculated pursuant to the provisions of section 205 of this act [40 P.S. § 1009.-205]; and

(B) reasonable expenses of a victim for hiring a substitute to perform self-employment services, thereby mitigating loss of income, or for hiring special help, thereby enabling a victim to work and mitigate loss of income.

40 P.S. § 1009.103. Although numerous questions of statutory interpretation arose following passage of the Act, a significant issue involved whether a "deceased victim" could receive work loss benefits. While several lower state courts determined that work loss benefits were only available to victims who survive a motor vehicle accident, *see, e.g., Pontius v. United States Fidelity & Guaranty Co.*, 100 Dauphin 133 (Pa.C.P.1978); *Winegart v. State Farm Mutual Automobile Insurance Co.*, No. 77–5–3437 (York County C.P., filed April 4, 1978); *Anderson v. Nationwide Insurance Co.*, No. 76–19366 (Montgomery Co. C.P., filed February 24, 1978); *Heffner v. Allstate Insur-*

*ance Co.*, No. 76–3406 (Philadelphia County C.P., filed November 28, 1977); the Superior Court of Pennsylvania and the Supreme Court of Pennsylvania both concluded otherwise. *Heffner v. Allstate Insurance Co.*, 265 Pa.Super.Ct. 181, 401 A.2d 1160 (1979), *aff'd*, 491 Pa. 447, 421 A.2d 629 (1980); *Pontius v. United States Fidelity & Guaranty Co.*, No. 80 March Term, 1978 (Pa.Super. Ct., July 3, 1979), *aff'd*, 491 Pa. 447, 421 A.2d 629 (1980). In the action at bar, Plaintiffs contend that Defendants have refused to provide insurance coverage for work loss benefits of deceased victims and to make payment of such benefits to individuals entitled thereto even though the No-Fault Act mandates such minimum coverage. Specifically, Plaintiffs allege that, in furtherance of a conspiracy to restrain trade, Defendants have taken concerted action to

A. Join in a common plan of refusing or delaying payments of said benefits based on jointly conceived spurious legal grounds;

B. Refuse to compete in providing services such as payment of said benefits to policyholders;

C. Provide for a uniform defensive posture regardless of the differences in the policies of insurance issued by each of the Defendants;

D. Conceal from potential claimants their rights to bring claims for work loss benefits;

E. Restrain competition among themselves by refusing to compete in offering to potential customers and claimants competitive benefits or claims service with regard to decedent's work loss;

F. Conspire to [sic] fix the type and amount of claims services with regard to no-fault work loss benefits for decedents.

Complaint, ¶ 14.

Although Defendants have sought resolution of this action in three different ways,

---

class action certification is rendered moot by this Memorandum and Order.

**4.** On March 13, 1981, Plaintiffs filed a petition for a restraining order ancillary to the class action against Defendant State Farm Mutual Automobile Insurance Co. Since Plaintiffs did

not submit a brief in support of that motion within ten days of filing the motion as required by Local Rule of Court 401.5, the court has deemed the motion to be withdrawn pursuant to the Local Rule.

the grounds upon which they rely are substantially the same. First, they contend that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, exempts the conduct in question from federal antitrust legislation. Second, they claim that the "state action" doctrine immunizes the alleged activity from antitrust scrutiny. In addition, Defendants assert that their activities constitute an exercise of their First Amendment rights which is outside the scope of the antitrust laws in accordance with the *Noerr-Pennington* doctrine. Finally, Defendants claim that Plaintiffs have failed to allege a restraint of trade or any other antitrust violations.

## II. Plaintiffs' Claims Pursuant to 15 U.S.C. §§ 2, 3, 6 and 13

█ In the complaint, Plaintiffs allege that this action is brought pursuant to 15 U.S.C. §§ 1 through 7, 13 and 15, *as amended*. Even if the court found that the complaint should not be otherwise dismissed, Plaintiffs have clearly failed to state a claim upon which relief can be granted based upon 15 U.S.C. §§ 2, 3, 6 and 13. 15 U.S.C. § 2 prohibits monopolies or attempts to monopolize. 15 U.S.C. § 3 affects only antitrust activities that involve a United States territory or the District of Columbia. 15 U.S.C. § 6 relates only to forfeiture of property in transit to the United States. Finally, 15 U.S.C. § 13 makes it unlawful to discriminate between different purchasers of commodities in prices, services or facilities. The court has reviewed the complaint and discovered no allegations that even vaguely hint at violations of those provisions. Moreover, Plaintiff has completely failed to respond to the arguments in favor of dismissal based on these contentions. Therefore, the complaint will be dismissed to the extent it raises antitrust claims pursuant to these provisions.[5]

## III. The McCarran-Ferguson Act

█ The McCarran-Ferguson Act provides in relevant part:

Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

Sec. 3.

.   .   .   .   .

(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

15 U.S.C. §§ 1012–1013. To come within the scope of this exemption, Defendants must show that the challenged activity is (1) part of the business of insurance, (2) regulated by state law and (3) not an agreement or act to boycott, coerce or intimidate. We address these requirements seriatim.

## A. Business of Insurance

As the Court of Appeals for the Third Circuit recently observed:

The McCarran-Ferguson Act contains no definition of the "business of insurance." The term appears in a statute

---

5. Accordingly, Plaintiffs' antitrust claim is limited to 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ...."

The remaining provisions merely relate to civil actions by private persons, 15 U.S.C. § 15; jurisdiction, 15 U.S.C. § 4; bringing in additional parties, 15 U.S.C. § 5; and definitions, 15 U.S.C. § 7.

creating a limited exemption to the antitrust laws, however, and thus falls within the compass of the general rule that even express exemptions from antitrust laws are narrowly construed. Thus the Court has held that the exemption is not applicable to all activities of insurance companies, but only to those activities falling within the "ordinary understanding" of the statutory phrase. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 [99 S.Ct. 1067, 1073, 59 L.Ed.2d 261] (1979); *SEC v. National Securities, Inc.*, 393 U.S. 453, 459–60 [89 S.Ct. 564, 568–569, 21 L.Ed.2d 668] (1969). *Owens v. Aetna Life & Casualty Co.*, 654 F.2d 218, 224 (3d Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 631 (1981) (footnote omitted). Commonly understood aspects of the business of insurance are spreading and underwriting of a policyholder's risk and the relationship between the insurer and insured. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. at 211–17, 99 S.Ct. at 1073–1076. As explained in *SEC v. National Securities, Inc.*,

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

393 U.S. at 460, 89 S.Ct. at 568–569. Clearly, the acts alleged in the complaint fall within this group of activities.

Cooperative efforts by Defendants with respect to collection of statistical data and ratemaking are unquestionably part of the business of insurance. The Third Circuit Court of Appeals has also recognized that the authorization of agents to solicit individual or group policies and the acceptance or rejection of coverages tendered by brokers is covered within the ambit of business of insurance. *Owens v. Aetna Life & Casualty Co.*, 654 F.2d at 226. We perceive no distinction between such conduct and joint undertakings concerning the interpretation and extent of coverage of the Pennsylvania No-Fault Motor Vehicle Insurance Act. In *McIlhenny v. American Title Insurance Co.*, 418 F.Supp. 364 (E.D.Pa.1976), the court granted a motion to dismiss when the complaint alleged that the defendant title insurance companies agreed among themselves to require purchasers of newly constructed homes to buy mechanic's lien insurance as part of their coverage. In so ruling, the court concluded that "[m]atters of rate, extent of coverage, and policy provisions go to the very heart of the relationship between the insurance company and the policyholder and therefore clearly fall within the *National Securities* definition of the business of insurance." *Id.* at 369. *See also Anglin v. Blue Shield of Virginia*, 510 F.Supp. 75, 78–79 (W.D.Va.1981) (extent of insurance coverage constitutes business of insurance). Although *McIlhenny* was decided prior to the *Royal Drug* case, we have not discerned any analysis in *Royal Drug* that would mandate a contrary result in *McIlhenny.*

The cases cited by Plaintiffs to support their position, however, concern agreements between insurance companies and noninsurers. *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (agreement between insurer and retail pharmacists); *Pireno v. New York State Chiropractic Assoc.*, 650 F.2d 387 (2d Cir. 1981) (agreement between insurer and peer review committee); [6] *St. Bernard Hospital v. Hospital Service Association of New Orleans, Inc.*, 618 F.2d 1140

---

**6.** In *Pireno*, the Second Circuit noted that "the specification of the terms of the contract between insurer and insured seems far more closely associated with the business of insurance than does the use of consultants in interpreting the policy limits." 650 F.2d at 394, n.11. Such language certainly detracts from the persuasive force of the *Pireno* decision as applied to the issues in this case.

(5th Cir. 1980) (contract between insurer and hospital); *Liberty Glass Co. v. Allstate Insurance Co.*, 607 F.2d 135 (5th Cir. 1979) (agreement to fix prices between insurers and glass installers). As such, those agreements undoubtedly went beyond the business of insurance. We find no similarity between the concerted conduct alleged in the complaint and the agreements in those cases.

Even if the alleged agreement to fix the extent of coverage regarding work loss benefits to victims of motor vehicle accidents is the business of insurance, Plaintiffs also attack the joint meetings to discuss common litigation strategy, coordinating defenses to prevent claimants from recovering work loss benefits and other combined efforts to avoid payment of work loss benefits to deceased victims. The court believes that such conduct is part of the business of insurance in that it relates to the interpretation and enforcement of the relationship between insurer and insured. *See SEC v. National Securities, Inc.*, 393 U.S. at 460, 89 S.Ct. at 568–569. Since these activities are necessary to carry out any agreement concerning the extent of insurance coverage and type of policy, they fall within the language of the statute. To rule otherwise would vitiate the effect of the agreement. In any event, as we explain in a subsequent portion of this memorandum, such conduct resulted from a dispute over state law. It does not constitute a restraint of trade or any other antitrust violation.[7]

### B. Regulated by State Law

The court has no difficulty in concluding that the alleged activity is regulated by Pennsylvania insurance law. Under the provisions of the No-Fault Act,

Approval of terms and forms.—Terms and conditions (including forms used by insurers) of any contract, certificate, or other evidence of insurance sold or issued pursuant to this State's no-fault plan for motor vehicle insurance in accordance with this act and providing no-fault benefits or any required tort liability are subject to approval and regulation by the commissioner. The commissioner shall approve only terms and conditions which are consistent with the purposes of this act and fair and equitable to all persons whose interests may be affected. The commissioner may reasonably limit by rule the variety of coverage available in order to give purchasers of insurance a reasonable opportunity to compare the cost of insuring with various insurers.

40 P.S. § 1009.209(b). The No-Fault Act further requires that insurers who desire to write insurance applicable to motor vehicle accidents "shall, as a condition of qualifications, prepare and file policy forms and insurance rates, for coverages effected by this act." 40 P.S. § 1009.504(a). Moreover, the Unfair Insurance Practices Act, 40 P.S. §§ 1171.1–.15 (Purdon's Supp. 1981), also regulates the alleged activities of the Defendants. This law prohibits unfair methods of competition and unfair or deceptive practices in the business of insurance, which include, in part:

(4) *Entering into any agreement to commit, or by any concerted action committing, any act or boycott, coercion or intimidation* resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance.

. . . . .

(10) Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices:

(i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue.

. . . . .

(vi) *Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.*

(vii) Compelling persons to institute litigation to recover amounts due under an

7. *See* p. 466 *infra*.

insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

40 P.S. § 1171.5 (emphasis added). *See Steinberg v. Guardian Life Insurance Co. of America*, 486 F.Supp. 122, 124 (E.D.Pa. 1980); *Black v. Nationwide Mutual Insurance Co.*, 429 F.Supp. 458 (W.D.Pa.1977), *aff'd*, 571 F.2d 571 (3d Cir. 1978). *See also* 7 Von Kalinowski, Antitrust Laws and Trade Regulation, § 47.02[2].

#### C. Agreement or Act to Boycott, Coerce or Intimidate

The final prerequisite to qualify for McCarran-Ferguson Act immunity is that the challenged activity is not an agreement or act to boycott, coerce or intimidate. 15 U.S.C. § 1013(b). "A boycott cognizable under the antitrust laws is a concerted refusal to deal." *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195, 1206 (7th Cir. 1981), *appeal pending*. The standard by which we determine whether a boycott is alleged in the complaint is set forth in *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). In that case, the Court based its decision on the following factual allegations:

> During the period in question, petitioners St. Paul Fire & Marine Insurance Co. (St. Paul), Aetna Casualty & Surety Co., Travelers Indemnity of Rhode Island (and two affiliated companies), and Hartford Casualty Co. (and an affiliated company) were the only sellers of medical malpractice insurance in Rhode Island. In April 1975, St. Paul, the largest of the insurers, announced that it would not renew medical malpractice coverage on an "occurrence" basis, but would write insurance only on a "claims made" basis. Following St. Paul's announcement, and in furtherance of the alleged conspiracy, the other petitioners refused to accept applications for any type of insurance from physicians, hospitals, or other medical personnel whom St. Paul then insured. The object of the conspiracy was to restrict St. Paul's policyholders to "claims made" coverage by compelling them to "purchase medical malpractice insurance from one insurer only, to wit defendant, St. Paul, and that [such] purchase must be made on terms dictated by the defendant, St. Paul." It is alleged that this scheme was effectuated by a collective refusal to deal, by unfair rate discrimination, by agreements not to compete, and by horizontal price fixing, and that petitioners engaged in "a purposeful course of coercion, intimidation, boycott and unfair competition with respect to the sale of medical malpractice insurance in the State of Rhode Island."

*Id.* at 534–35, 98 S.Ct. at 2926–2927 (footnotes and citations omitted). The Court reviewed the legislative history of the McCarran-Ferguson Act and concluded that the term "boycott" should be construed in a "broad and unqualified" manner. *Id.* at 550, 98 S.Ct. at 2934. Accordingly, the Court determined that

> The conduct in question accords with the common understanding of a boycott. The four insurance companies that control the market in medical malpractice insurance are alleged to have agreed that three of the four would not deal on any terms with the policyholders of the fourth. As a means of ensuring policyholder submission to new, restrictive ground rules of coverage, St. Paul obtained the agreement of the other petitioners, strangers to the immediate dispute, to refuse to sell any insurance to its policyholders. "A valuable service germane to [respondents'] business and important to their effective competition with others was withheld from them by collective action." *Silver v. New York Stock Exchange*, 373 U.S. 341, 348–349, n.5 [83 S.Ct. 1246, 1252, n.5, 10 L.Ed.2d 389] (1963).
>
> *The agreement binding petitioners erected a barrier between St. Paul's customers and any alternative source of the desired coverage, effectively foreclosing all possibility of competition anywhere in the relevant market. This concerted refusal to deal went well beyond a private*

*agreement to fix rates and terms of coverage, as it denied policyholders the benefits of competition in vital matters such as claims policy and quality of service. Cf. Continental T.V., Inc. v. Gte Sylvania, Inc.*, 433 U.S. 36, 55 [97 S.Ct. 2549, 2560, 53 L.Ed.2d 568] (1977). *St. Paul's policyholders became the captives of their insurer. In a sense the agreement imposed an even greater restraint on competitive forces than a horizontal pact not to compete with respect to price, coverage, claims policy, and service, since the refusal to deal in any fashion reduced the likelihood that a competitor might have broken ranks as to one or more of the fixed terms. The conduct alleged here is certainly not, in Senator O'Mahoney's terms, within the category of "agreements which can normally be made in the insurance business," 91 Cong.Rec. 1444 (1945) or "agreements and combinations in the public interests [sic] which can safely be permitted,"* id., *at 1486,*

*Id.* at 552–53, 98 S.Ct. at 2935–2936. (footnote omitted) (emphasis added). A proper reading of the *St. Paul Fire* case indicates that an agreement to fix terms of coverage is comparable to an agreement to fix prices, and thus, does not constitute a boycott. If an agreement to fix rates is exempt under the McCarran-Ferguson Act, as Plaintiff acknowledges, Plaintiffs' Brief Contra Defendants' Motion to Dismiss, pp. 22–23, then this court perceives no basis for reaching a contrary result with respect to an agreement to interpret the No-Fault Act provisions regarding work loss benefits in the same way.

Unlike the agreement in *St. Paul Fire,* the agreement alleged in the complaint does not constitute a refusal to deal with consumers.[8] Individuals in the market for no-fault insurance were not limited with respect to the company from which they could purchase insurance coverage. Indeed, pursuant to the No-Fault Motor Vehicle Insurance Act, insurance companies had to provide coverage for work loss benefits. The alleged agreement or concerted action in this action only involved the interpretation of statutory language concerning the scope and extent of work loss benefits and attempts to obtain legislative and judicial approval of Defendants' interpretation. This wholly intra-industry agreement is akin to ratemaking. Such allegations do not constitute a concerted refusal to deal. Similarly, in *Quality Auto Body, Inc. v. Allstate Insurance Co.,* the court detected no boycott when "[t]he gravamen of Quality's complaint [did] not appear to be defendants' refusal to deal but rather defendants' refusal to pay more than the prevailing competitive price for labor and new parts." 660 F.2d at 1206. Moreover, policyholders continue to have "the benefits of competition in vital matters such as claims policy and quality of service." *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. at 553, 98 S.Ct. at 2936.

**8.** Plaintiffs' counsel has submitted three affidavits that he urges the court to consider in ruling upon the motions filed on behalf of Defendants. These affidavits are based upon "personal experience, hearsay comments from other plaintiff and defense counsel and insurance people, and from implication or inference after digesting numerous letters of rejection, preliminary objections and briefs filed by defense counsel and their insurance companies ...." Plaintiffs' Counsel's Affidavit, doc. no. 117, pp. 1–2. Defendants filed a motion to strike these affidavits for the reasons that such affidavits should not be considered in disposing of a motion to dismiss filed without supporting affidavits, the affidavits are speculative and not based upon personal knowledge, Plaintiffs' counsel would not be competent to testify about such facts in any hearing or trial and the filing of the affidavits by Plaintiffs' counsel constitutes a violation of the Code of Professional Responsibility. The parties submitted briefs with respect to the motion to strike. Although we agree with Defendants that affidavits submitted in connection with a motion must be based on personal knowledge and not information, belief or hearsay, *Gordon v. Watson,* 622 F.2d 120, 123 (5th Cir. 1980); *Orlik Ltd. v. Helme Products Inc.,* 427 F.Supp. 771, 778 (S.D.N.Y.1977), we will nevertheless deny the motion to strike at this time because we find nothing in the affidavits that alters the court's decision regarding the issue of whether Defendants' conduct constitutes a boycott. If anything, the affidavits support the view that the alleged agreement only concerned the interpretation of a provision in the No-Fault Act and was not a refusal to deal.

Plaintiffs must also allege an injury of the type the antitrust laws were intended to prevent and that flows from Defendants' conduct to state a cause of action under the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). They cannot transform what is basically a claim for violations of the No-Fault Motor Vehicle Insurance Act into an antitrust action merely by alleging a conspiracy between Defendants. *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341, 343 (9th Cir. 1969); *Huron Valley Hospital, Inc. v. City of Pontiac*, 466 F.Supp. 1301, 1315–16 (E.D.Mich.1979), *vacated on other grounds*, 666 F.2d 1029 (6th Cir. 1981). In *Anglin v. Blue Shield of Virginia*, 510 F.Supp. 75 (W.D.Va.1981), the court concluded:

> While the Plans have unquestionably not offered to the plaintiff the coverage he seeks, that coverage is not offered to anyone by the Plans, because it is not a coverage written by the Plans. While comparison is odious in general, and dangerous in particular in an opinion, at least an analogy can be drawn between the situation at bar, and a suit against General Motors and Ford Motor Co. because neither will now sell a 1981 convertible automobile to the plaintiff customer. The fact that neither motor company now offers a convertible model in the marketplace is at least analogous to the fact that the Plans do not offer in the marketplace the coverage desired by the plaintiff here.

*Id.* at 80–81. In the case before this court, Defendants did not offer the coverage sought by Plaintiffs because their interpretation of the No-Fault Act did not require such coverage. At least four lower state courts agreed with this position. While the state appellate courts held otherwise, they recognized the difficulty of divining the intent of the No-Fault Act and stated:

> At the outset we caution anyone who embarks on the high seas of Pennsylvania's No-Fault Motor Vehicle Insurance Act not to do so without a good compass, a knowledge of reefs and storms and plenty of food and water. Any attempt

to choose an alternate route by land in an effort to unlock the secrets of the Act will encounter mazes of paths, pitfalls, underbrush and dead ends. In attempting to explain what should be the rudimentary "work loss" compensatory scheme, no less an experienced guide than the Pennsylvania Bar Institute was forced to conclude that the Act is impenetrable. In its book, Pennsylvania No-Fault Motor Vehicle Insurance Act—Practice Under the Act (Pub. # 61, 1975), PBI unequivocally asserts:

> "It is not possible to determine with any degree of certainty the amount of work loss benefits required to be paid under the act. . . . The act is essentially incapable of execution since there are at least four possible interpretations of how 'basic loss benefits' for 'work loss' are calculated. None of the interpretations properly use all of the act and the provisions are apparently totally irreconcilable." *Id.* at 22.

*Heffner v. Allstate Insurance Co.*, 265 Pa. Super.Ct. 181, 184, 401 A.2d 1160, 1161 (1979). Under such circumstances, this court discerns no antitrust violation. Indeed, Plaintiff Nye has initiated a class-action suit in assumpsit against these Defendants in the Dauphin County Court of Common Pleas based upon the No-Fault Act and thus has recognized the actual nature of the claim. *Nye v. Erie Insurance Exchange*, No. 5349–S–79 (Dauphin Co. C.P.). Accordingly, the motions to dismiss will be granted.

Since the court has determined that it should grant the motions to dismiss, it is also convinced that the motions for judgment on the pleadings and summary judgment are meritorious.

In considering a motion for judgment on the pleadings, this court is required to view the facts presented in the pleadings and the inference to be drawn therefrom in the light most favorable to the nonmoving party. The motion will be granted only if the movant establishes that no material issue of fact awaits resolution and that he is entitled to judgment as a matter of law.

*Alken v. Lerner*, 485 F.Supp. 871, 873 (D.N. J.1980) (citations omitted). Similarly, in considering the motion for summary judgment, this court must consider the pleadings, affidavits and other documents to determine whether they show that no genuine issue as to any material fact exists and that Defendants are entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56. We have applied these legal principles to the motions before the court and have viewed the facts in a light most favorable to Plaintiffs. In addition, we have examined the stipulation of facts (doc. no. 121) agreed upon by Plaintiffs and the three Defendants who filed the summary judgment motion and which are deemed undisputed for purposes of that motion. Moreover, we considered the statements in the affidavits of Plaintiffs' counsel. After such deliberation, the court has found no material issue of fact and concluded that on the basis of the McCarran-Ferguson Act, as previously explained, the motions for judgment on the pleadings and summary judgment should be granted.[9]

### IV. Conclusion

On the basis of the foregoing, the court concludes that the motion for summary judgment filed by Defendants Aetna Casualty & Surety Co., General Accident Group, and Hartford Insurance Group, the motions for judgment on the pleadings submitted by Defendants Allstate Insurance Co., CNA Insurance Co., Liberty Mutual Insurance Co., and Ohio Casualty Insurance Co., and the motions to dismiss filed by the remaining Defendants should be granted.

An appropriate order will be entered.

---

**9.** Although several Defendants have also raised the "state action" doctrine as a basis for dismissal of this action, we would deny such motions on that ground.

*The threshold inquiry* in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe *is whether the activity is required by the State acting as sovereign.* Here we need not inquire further into the state-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent.

.  .  .  .  .

It is not enough that, as the County Bar puts it, anticompetitive conduct is "prompted" by state action; rather, *anticompetitive activities must be compelled by direction of the State acting as a sovereign.*

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790-91, 95 S.Ct. 2004, 2014–2015, 44 L.Ed.2d 572 (1975) (emphasis added). This court cannot determine from the face of the complaint that the alleged activities are *required* by the State acting as sovereign.

Similarly, several Defendants rely upon the *Noerr-Pennington* doctrine to establish immunity from the alleged antitrust violations. This doctrine based upon decisions of the Supreme Court in *Eastern Railroad Presidents Confer-*ence v. *Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), sets forth "the general rule that lobbying and other similar concentrated efforts by businessmen to obtain legislative or executive action do not violate the antitrust laws, even though intended to eliminate competition or otherwise restrain trade." 7 Von Kalinowski, Antitrust Laws and Trade Regulation, § 46.04, p. 46–35. Attempts to utilize administrative and judicial processes are also exempted under this doctrine. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Of course, resort to such activities as a mere sham to cover anticompetitive conduct is not exempt. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. at 511–15, 92 S.Ct. at 612–614; *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. at 144, 81 S.Ct. at 533. Nevertheless, having determined that the McCarran-Ferguson Act applies to the conduct alleged in the complaint, we decline to rule upon Defendants' claims of *Noerr-Pennington* immunity, particularly since some of the conduct alleged in the complaint falls outside the scope of the doctrine and because Plaintiffs alleged that Defendants agreed upon "jointly conceived *spurious* legal grounds." (Emphasis added).